J-S22005-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.M.T., A MINOR | : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: O.L.T., MOTHER | | |
| | | No. 141 MDA 2019 |

Appeal from the Order Entered January 3, 2019
In the Court of Common Pleas of York County Orphans' Court at No(s):
2017-0156

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.M.T., A MINOR | : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: O.L.T., MOTHER | | |
| | | No. 142 MDA 2019 |

Appeal from the Order Entered January 3, 2019
In the Court of Common Pleas of York County Orphans' Court at No(s):
2017-0157

BEFORE:   SHOGAN, J., DUBOW, J., and PELLEGRINI*, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED JUNE 18, 2019**

O.L.T. ("Mother") appeals from the January 3, 2019 decrees granting

the petitions filed by York County Office of Children, Youth and Families ("CYF"

or "Agency") for the involuntary termination of her parental rights to her twin

_____
*   Retired Senior Judge assigned to the Superior Court.

sons, J.M.T. ("J.M.T.1") and J.M.T. ("J.M.T.2") (collectively "Children"), born in June of 2012.[1]  Upon careful review, we affirm.

A prior panel of this Court set forth the procedural history of this case as follows.

> On April 28, 2016, CYF received allegations that Mother left Children without supervision.  The York City Police Department responded to Mother's residence and found Children alone. Mother returned to the residence twenty minutes later and smelled of alcohol.  Mother was incarcerated on April 28, 2016, for endangering Children's welfare.  Mother's cousin, R.M. (Foster Mother), came forward as a resource for Children and was approved as an emergency caregiver.
>
> On April 29, 2016, the Agency filed applications for emergency protective custody.  Attorney Thomas L. Kearney, IV, was court-appointed guardian *ad litem* (GAL) for Children.  In orders for emergency protective custody dated April 29, 2016, the trial court concluded that there was sufficient evidence to prove that continuation or return of the minor children to the Mother's home was not in the best interest of Children.  The trial court temporarily awarded legal and physical custody of Children to the Agency, and Children were placed with Foster Mother.
>
> On May 4, 2016, the Agency filed dependency petitions.  The following day, Mother was released from prison, and began having unsupervised contact with Children.  Justice Works opened for services with Mother on May 17, 2016.  On May 31, 2016, a first family service plan (FSP) was prepared for Mother, which permitted unsupervised visitation at Mother's home.[2]

---

[1] The subject decrees also involuntarily terminated the parental rights of Children's father, L.A.T. (Father).  Father did not file notices of appeal and is not involved in this appeal.

[2] Mother's FSP goals have remained consistent throughout the case, and they included, in part, maintaining stable housing and employment, participating in visits with Children, and having negative drug and alcohol screenings.  N.T., 5/28/17, at 29.

On June 20, 2016, a CYF caseworker made a field visit to Mother's residence and found Children outside and unsupervised. The caseworker repeatedly knocked on Mother's door. Mother did not answer the door for approximately fifteen minutes. After that incident, Mother's visits with Children were changed to visits supervised by Foster Mother.

On July 19, 2016, the trial court adjudicated Children dependent under 42 Pa.C.S. § 6302(1). The court maintained legal and physical custody with the Agency and ordered Children to remain in kinship care. The permanency goal was to return to a parent or guardian, with a concurrent goal of adoption. On September 20, 2016, Justice Works closed services as unsuccessful.

On August 29, 2017, CYF filed petitions to involuntarily terminate the parental rights of Mother and change Children's permanency goal to adoption under 23 Pa.C.S. § 2511(a)(1), (8), and (b). On September 8, 2017, the trial court entered orders appointing the GAL, Attorney Kearney, to serve as Children's legal counsel.

On December 15, 28, and 29, 2017, the trial court conducted an evidentiary hearing on the petitions.[3] Mother and her counsel were present. Children were present and were represented by Attorney Kearney as their GAL and legal counsel. On December 29, 2017, the trial court found that CYF established grounds for termination of Mother's parental rights under 23 Pa.C.S. § 2511(a)(1), (8), and (b).

---

[3] On December 15, 2017, CYF presented the testimony of Tameeka Way, the family resource specialist at Justice Works Youth Care, and Melanie Wurster and Carla Arp, caseworkers at Pressley Ridge. In addition, the trial court interviewed Children *in camera*. On December 28, 2017, CYF presented the testimony of Michelle Rau, a drug and alcohol monitoring specialist at Families United Network, and Brandon Ambrose, the CYF caseworker. On December 29, 2017, Mother testified on her own behalf, and she presented the testimony of Foster Mother and her cousins, L.T. and L.B. In addition, Mother called Ms. Arp on rebuttal.

*In re Adoption of J.M.T.*, 198 A.3d 445, 202, 203 MDA 2018 (Pa. Super.,

filed September 11, 2018) (Unpublished Memorandum at 2–4).

Thereafter, the orphans' court involuntarily terminated the parental

rights of Mother and Father by decrees entered on January 12, 2018, and

Mother timely appealed. Without addressing the merits of the appeal, a prior

panel of this Court vacated the decrees and remanded the case for the

orphans' court to appoint new legal counsel for Children to ascertain their legal

interests and to notify the orphans' court if the result of the termination

proceeding was consistent with those interests.[4] *See Adoption of J.M.T.*,

202, 203 MDA 2018 (Unpublished Memorandum at 11–12). Further, the panel

directed that the orphans' court "shall conduct a new hearing only if it provides

Children with an opportunity to advance their legal interests through new

counsel." *Id.* at 12.

The certified record reflects that the court appointed Barbara Stump,

Esquire, as Children's legal counsel on September 24, 2018. Attorney Stump

---

[4] Our Supreme Court has held that a subject child of a contested involuntary termination proceeding has a statutory right to counsel, who discerns and advocates for the child's legal interests. Our Supreme Court has defined this as a child's preferred outcome. *See In re T.S.*, 192 A.3d 1080 (Pa. 2018) (citing *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017)); *see also* 23 Pa.C.S. § 2313(a). Because the right to counsel belongs to the child who is unable to address a deprivation of his right to counsel on his own behalf, we must address this issue *sua sponte*. *See In re Adoption of T.M.L.M.*, 184 A.3d 585, 588 (Pa. Super. 2018) ("This Court must raise the failure to appoint statutorily-required counsel for children *sua sponte*, as children are unable to raise the issue on their own behalf due to their minority.") (citing *In re K.J.H.*, 180 A.3d 411, 414 (Pa. Super. 2017)).

filed a report on November 21, 2018, in which she asserted that she reviewed the prior proceedings and met with Children on three occasions. She stated that Children "wish to stay together and to remain a permanent part of the kinship family. They exhibited a strong trust in having [Foster Mother] make important decisions for them and to take care of them." Report, 11/21/18, at ¶ 7.

On December 6, 2018, the orphans' court held a hearing during which Attorney Stump relied upon her report and testified, "I believe the result of what happened [in the prior proceedings] is exactly what [C]hildren's legal interests would have directed." N.T., 12/6/18, at 7. Based on Attorney Stump's report and testimony, the orphans' court determined that a new hearing was unnecessary. *Id.* at 9. By decrees dated December 6, 2018, and entered on January 3, 2019, the orphans' court once again involuntarily terminated the parental rights of Mother.

Mother timely filed notices of appeal and concise statements of errors complained of on appeal, which this Court consolidated *sua sponte*. The orphans' court filed an opinion pursuant to Pa.R.A.P. 1925(a) on January 24, 2019, wherein it relied on its prior opinion dated February 15, 2018.

On appeal, Mother presents the following issues for our review:

I.      Whether the [orphans'] court erred in involuntarily terminating the parental rights of the natural mother pursuant to Section 2511(a)(1) of the Adoption Act[?]

II.    Whether the [orphans'] court erred in involuntarily terminating the parental rights of the natural mother pursuant to Section 2511(a)(8) of the Adoption Act[?]

III.    Whether the [orphans'] court erred in concluding that an involuntary termination of parental rights of the natural mother would best serve the needs and welfare of the children pursuant to Section 2511(b) of the Adoption Act[?]

Mother's brief at 5 (unpaginated).

We review this appeal according to an abuse-of-discretion standard, as follows:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the orphans' court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the orphans' court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The orphans' court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to orphans' courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Instantly, we conclude that the certified record supports the decree pursuant to Section 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b); *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that this Court must agree with the orphans'

court only as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm).[5]

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted). We have explained:

> [T]he orphans' court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re N.M.B.*, 856 A.2d 847, 854–855 (Pa. Super. 2004) (citations omitted).

Our Supreme Court has explained that parental duty "is best understood in relation to the needs of a child." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977).

> A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a

---

[5] Based on our disposition, we need not review Mother's second issue regarding Section 2511(a)(8).

benefactor, parental duty requires that a parent "exert himself to take and maintain a place of importance in the child's life."

*Id.* (citations omitted).

With respect to Section 2511(b), this Court has stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the orphans' court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted).

On appeal, Mother argues that the orphans' court abused its discretion with respect to Section 2511(a)(1) in that Mother has complied with and made progress in her FSP goals. Mother's Brief at unnumbered 29. Mother states that she has lived in the same house for thirteen years, and she is employed. In addition, she has had negative drug and alcohol test results. Mother's Brief at unnumbered 20 n.4.

The orphans' court agreed that the evidence demonstrated that Mother successfully met those goals, but it stated on the record in open court at the conclusion of the testimonial evidence, "The problem is that the things that [Mother] has done have not made up for the things that she has not done." N.T., 12/29/17, at 2–3. Specifically, the orphans' court found that Mother's visits remain supervised, and that she has not played an active role in Children's dental care, speech therapy, or education, including their

Individualized Education Programs ("IEP").  *Id.* at 3, 5.  Moreover, the orphans' court emphasized that Mother "has been looking for a scapegoat and has not really been stepping up.  It seems to be about minimizing her behavior and placing blame." *Id.* at 3.

Mother acknowledges that she did not progress to unsupervised visits with Children, but she asserts this is because of obstacles posed by Foster Mother, who is her first cousin, during the time that she supervised visits. Mother's Brief at unnumbered 29–31.  Mother's claim is without merit.

The record reveals that Foster Mother supervised Mother's visits with Children for approximately one year, until July of 2017.  N.T., 12/29/17, at 93.  Brandon Ambrose, the CYF caseworker, testified that Mother's attendance was inconsistent during that time.  N.T., 5/28/17, at 38.  Mr. Ambrose acknowledged on direct examination that the supervised visits were "causing a lot of strain" on Mother's family.  N.T., 5/29/17, at 14.  As such, from July until September of 2017, CYF supervised Mother's visits at their office instead of Foster Mother supervising the visits in her home.  The visits occurred once per week, and Mother attended regularly.  N.T., 5/28/17, at 38; N.T., 5/29/17, at 15.  In September of 2017, after CYF filed the involuntary termination petitions, it referred Mother to Pressley Ridge for supervised visits.  N.T., 5/28/17, at 38.  The supervised visits at Pressley Ridge commenced in October of 2017.  They occurred twice per week, and Mother attended regularly.  *Id.* at 38–39; N.T., 5/29/17, at 15.

Foster Mother testified that when she supervised visits, she allowed Mother to come to her house anytime she wanted to visit Children, in addition to the supervised visitation schedule established by the court. N.T., 5/29/17, at 60, 93. Foster Mother testified that she maintained logs of Mother's visits. *Id.* at 57-58. She stated that Mother did not attend visits frequently. *Id.* at 93-94. Foster Mother testified that Mother never called to cancel any scheduled visit. She just would not "show up." *Id.* Foster Mother stated that Children "would get upset when Mom didn't come for a visit." *Id.* at 95.

Foster Mother testified that she and Mother "had a really good relationship" until October of 2017, when Mother stopped talking to her. N.T., 5/29/17, at 53. She explained that she and Mother had an argument because Mother "asked me to do something that I couldn't do, and I told her no, and she called me a B----, and said, oh, you're just worried about your foster care license and stuff." *Id.* at 65–66. Foster Mother specified on cross-examination by the GAL that Mother "wanted to get her visits up, and she wanted me to cover her on some of the visits, just put down some visits that she didn't come to." *Id.* at 95–96. In short, Foster Mother testified that Mother wanted her to lie to CYF that Mother was attending visits when she was not, and Foster Mother refused to do so. *Id.* at 96. Foster Mother explained that in July of 2017, CYF began to supervise the visits instead "[b]ecause they wanted to have somebody else that was a mandated

- 11 -

report[er] be able to report on the visits and take it out of my hands." *Id.* at 64.

Mother testified on direct examination that there "would be a lot of conflict with me and [Foster Mother]" during supervised visits "because to me it was like [Foster Mother] was trying to—it was all about control, and she knew she had control." N.T., 12/29/17, at 149. Mother continued:

So I would come in [to Foster Mother's home], and I would be upset, like I said, because my sons to me were not being -- their appearance. Just everything. I felt like [J.M.T.2] was always chubby, he was mad. He was getting skinny. They didn't smell like me. I would get their hair regularly cut.

I was just upset when I got there because I messed up. I made a mistake. And I'm paying for it, and I'm paying for it now and my sons are paying for it.

*Id.* at 149-50. Nevertheless, Mother testified that she believes Children are safe with Foster Mother. *Id.* at 176.

Mother testified, "I dropped the ball on visits, yes, I did, but she made my visits hell. I will tell you that now." N.T., 12/29/17, at 153. She explained that Foster Mother "constantly nags, and she never said anything positive." *Id.* Mother gave an example of one occasion when she was outside in the front of Foster Mother's home with Children, and she went to the corner to talk to a former co-worker. Mother testified that Children rode "their bikes up to me. Foster Mother's house is right here. She sees me. Oh, they can't be up there with you. You gotta bring them back down here. You're on your visit. I'm like, okay. They're right here with me. We're outside." *Id.*

The orphans' court made credibility determinations in favor of Foster Mother and against Mother. As such, the court found that Mother's narrative "seems to be about minimizing her behavior and placing blame." N.T., 12/29/17, at 3. The court found that Foster Mother "was proper in her behavior as the supervisor of [C]hildren." Orphans' Court Opinion, 2/16/18, at 3. Based on the foregoing testimony, we do not disturb the court's findings. *See In re T.S.M.*, 71 A.3d at 267 (stating that appellate courts must "accept the findings of fact and credibility determinations of the orphans' court if they are supported by the record.").

In addition, the orphans' court emphasized:

> Mother has demonstrated a lack of parental judgment that has and would continue to put [C]hildren at risk. She has not addressed this issue such that she is currently able to take custody, nor has she fulfilled her parental duties in any substantial way.

Orphans' Court Opinion, 2/16/18, at 5-6. The orphans' court's conclusion is supported by the testimony of Ms. Arp, the Pressley Ridge caseworker who supervised visits, with respect to a safety concern that arose during a visit on November 17, 2017. N.T., 12/15/17, at 63.

Ms. Arp testified that she received a request from Mother's adult daughter, Q., for her to drive Children, then five years old, along with Mother, to Sky Zone, an indoor trampoline park, for a birthday party for Q.'s daughter. N.T., 12/15/17, at 63, 65. Mother told Ms. Arp that Children would be home by 8:00 p.m., and on three separate occasions, Mother advised that the event

would occur at the Sky Zone in Lancaster, not the one in Mechanicsburg. ***Id.*** at 64, 80, 85. The community visit was permitted for two hours on the condition that Ms. Arp would meet them at Sky Zone and supervise the visit.

Ms. Arp testified that she drove to Lancaster, only to find that the event was taking place at the Sky Zone in Mechanicsburg. N.T., 12/15/17, at 64. She then drove to that location. ***Id.*** Q. picked Children up at Foster Mother's home at approximately 5:00 p.m., and they arrived at Mother's house soon thereafter. ***Id.*** at 81. They left Mother's house at approximately 5:30 p.m., and they arrived at Sky Zone in Mechanicsburg at 6:30 p.m., as the driving distance to the Mechanicsburg location is approximately one hour. ***Id.*** at 82–83. The party began at 7:00 p.m., so the conclusion of the community visit was delayed, and it exceeded two hours. ***Id.*** at 64, 84. Ms. Arp testified that when the party was over, she learned that Mother had not fed the Children dinner. ***Id.*** at 86. Ms. Arp testified that "apparently their plan" was to buy fast food on the ride home. ***Id***.

Moreover, Foster Mother informed Ms. Arp that when Children arrived home, she noticed they were not in car seats in Q.'s vehicle. N.T., 12/15/17, at 87. Ms. Arp testified on re-direct examination by CYF as follows:

> Q. So when Mother had an opportunity to parent more than an hour-and-a-half, there seemed to have been some problems or concerns, weren't there?
>
> A. The visit was a nightmare.

Q. What do you mean when you had indicated [in an e-mail to CYF documenting the visit], "Mom blames everyone else." What do you mean by that?

A. At that time, [Mother] was not appearing to take responsibility for her need to protect the boys by putting them in car seats. At that time, I was referring to her indicating that [F]oster [M]other set her up and that she wasn't the actual driver of the car. That was right after the incident had taken place.

Q. Recognizing the extended period of time where [M]other was interacting with [C]hildren during that night, does that create concern on your part about [M]other's ability to meet the safety needs and other needs of [C]hildren for a period of time greater than an hour-and-a-half?

A. At that time, yes.

*Id.* at 104-105. Ms. Arp testified, "I think [Mother] was really just struggling to understand the seriousness." *Id.* at 105.

Based on the foregoing testimony, the orphans' court found the following on the record in open court:

[W]hat is striking was the one time Mother was given an opportunity to have time unsupervised, she gave the wrong place that she was going to be, not even with the right city, and failed to make sure that [C]hildren were in appropriate safety restraints while traveling by vehicle. That called into question significant issues with regard to Mother's judgment as an adult, let alone her judgment as a parent.

No adult should allow a child at any time to be in a car at their ages unrestrained, let alone [M]other, under those circumstances, when she knew that the court would be looking very carefully at the safety of [C]hildren.

N.T., 12/29/17, at 5-6.

We conclude that the testimonial evidence supports the orphans' court's

determination that, far in excess of six months preceding the filing of the

- 15 -

involuntary termination petitions on August 29, 2017, Mother refused or failed to perform her parental duties. Specifically, Mother refused or failed to attend visits regularly with Children for the year, concluding in July of 2017, that Foster Mother supervised them. Mother's relationship with Foster Mother deteriorated, in part, when Mother asked Foster Mother to document the number of visits she attended falsely, and Foster Mother refused. Further, the totality of the testimonial evidence supports the court's conclusion that Mother demonstrated a lack of parental judgment that placed Children's safety and well-being at risk. In addition, Mother's testimony corroborates the court's finding that she has not performed her parental duties with respect to Children's educational or medical needs. *See* N.T., 12/29/17, at 180–181 (Mother testified, "I haven't done anything with regard to educational needs;" Mother did not know when she last attended a medical appointment for Children). Accordingly, we affirm the decrees with respect to Section 2511(a)(1).

With respect to Section 2511(b), Mother argues that the court abused its discretion because a strong bond exists between Mother and Children. Mother argues that Children's relationship with her is beneficial because she can satisfy their needs and welfare. Mother's Brief at unnumbered 35. We disagree.

The following case law is relevant:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (orphans' court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),

> [I]n addition to a bond examination, the orphans' court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the orphans' court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

In considering the affection that a child may have for his natural parents, this Court has stated the following:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and

emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted).

Furthermore, our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. The Court directed, in weighing the bond considerations pursuant to Section 2511(b), that "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In this case, the orphans' court found that although Children have a bond with Mother, they "look to and depend on [Foster Mother] as that of a parental figure." Orphans' Court Opinion, 2/16/18, at 5. The court concluded that Children's bond is stronger with Foster Mother. *Id.* at 6. The court reasoned: "Given [C]hildren's age, their length of time in placement, the stronger bond with [F]oster [M]other over Mother, and their emotional needs, it is in the best interest of [C]hildren" to terminate Mother's parental rights. *Id.* The record supports the orphans' court's findings.

There is no dispute in the certified record that Children know Mother as their mother and that they are bonded to her. Mr. Ambrose had been the CYF

caseworker for this family for fourteen months at the time of the subject proceedings. He visits Children in their kinship foster home once per month. Mr. Ambrose testified that Children share a parental bond with both Mother and Foster Mother, but their bond with Foster Mother is stronger because she has been meeting all of their needs for the twenty months that they have resided in kinship care. N.T., 12/28/17, at 40, 42–43. He also testified that Foster Mother is a pre-adoptive resource. *Id.* at 51.

Upon thorough review, there is no testimonial evidence in this case that terminating Mother's parental rights will have a detrimental effect on Children. As discussed *supra*, Children's legal counsel reported to the orphans' court that Children "wish to stay together and to remain a permanent part of the kinship family. They exhibited a strong trust in having [Foster Mother] make important decisions for them and to take care of them." Report, 11/21/18, at ¶ 7. We also observe that Children's counsel and their GAL joined in CYF's brief in this case, wherein they argue in support of involuntary termination. For all of the foregoing reasons, the record supports the orphans' court's conclusion that terminating Mother's parental rights will serve Children's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). Accordingly, we affirm.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 06/18/2019